GROVER GODWIN, Appellant, v. L. WILLIAM GERLING ET AL., Respondents, No. 42023—239 S. W. (2d) 352.

Division One, April 9, 1951.

Motion to Transfer to Banc Overruled, May 14, 1951.

20

*Sluggett & Sluggett* and *John T. Sluggett* for appellant.

*Edwards, Metcalfe & Strong* and *Thomas M. Meyersieck* for Roosevelt Federal Savings & Loan Assn. of St. Louis and Jules Q. Strong, Trustee; *Earl G. Smith* for St. Louis County Federal Savings & Loan Assn. and C. J. Gerling, Trustee; *Robert A. Hamilton* for Equitable Life Assurance Society of the United States and Edward W. Lake, Trustee; *Philip Gallop* for State Bank & Trust Co. of Wellston and Fred L. Wuest, Trustee; *Igoe, Carroll & Keefe* and *Wm. H. Ferrell* for Citizens Natl. Bank of Maplewood and L. E. Evans, Trustee, respondents.

*Earl G Smith* for respondent L. William Gerling.

22

*Arthur U. Simmons* for respondents James R. Cody et al.

 LOZIER, C.—This is a suit to set aside a trustee's deed executed pursuant to a foreclosure under power of sale in a deed of trust upon lots in a subdivision in Ferguson. Certain allegations of the petition are hereinafter set out. Plaintiff sought no money judgment. His prayer was that the sale and deed be declared null, void and of no effect, that the defendants be held to have no right, title or interest in the lots, and that the fee simple title be vested in plaintiff, subject to the provisions of the foreclosed deed of trust.

Among the defendants were: the makers of the notes and the securing deed of trust foreclosed; the assignee of the notes and deed of trust and purchaser at the sale; and the two grantees of such purchaser. (The trustee, originally a defendant, died and his executors were substituted. Their motion for judgment upon the pleadings was sustained.) The numerous other defendants were either subsequent purchasers for valuable considerations under recorded deeds from the two grantees of the purchaser at the sale, or were the holders of negotiable notes secured by recorded deeds of trust executed by such subsequent purchasers. Also joined were the unknown owners of negotiable notes secured by other recorded deeds of trust upon some of the lots.

The purchasers-defendants and their mortgagees-defendants filed counterclaims and cross-petitions. The trial judge found for defendants and dismissed both the petition and the counterclaims and cross-claims. Plaintiff appealed.

The primary issue involves construction of the Soldiers' and Sailors' Civil Relief Act of 1940 (54 Stat. 1178), as amended in 1942 (56 Stat. 769), 50 U. S. C. A., App., Secs. 510 et seq. Subsection 3 of Sec. 532 makes invalid foreclosure under power of sale except by agreement or under court order. The provisions of Sec. 532 are limited to obligations secured by mortgage, trust deed or other security in the nature of a mortgage upon property "owned by a person in military service at the commencement of the period of military service and still so owned by him which obligations originated prior to such person's period of military service." It was and is plaintiff's-appellant's position that, under Subsection 1, he "owned" the real estate when he entered military service; that he "still so owned" it when he filed his suit; and that the foreclosure without agreement or court order was void.

Plaintiff testified that for many years he had "handled preparation and recording of deeds" and "engaged in the loan business" in connection with his real estate activities; that, while not licensed to

24

practice law, in handling his real estate business he had studied real estate law for 20 or 25 years and was "acquainted with some of the things that pertain to real estate"; that for several years he had been chief underwriter for the district FHA. As such, he "passed upon" real estate loans.

Prior to February, 1937, plaintiff had been in the real estate business 15 or 20 years, and Gertrude E. Baehr had been his secretary and bookkeeper for 10 or 12 years. Prior to that date, plaintiff had contracted to exchange real estate personally owned by him for the lots involved. "For his convenience," plaintiff caused the title to be taken in Miss Baehr's name. These deeds were recorded. In one, some of the lots were made subject to a recorded $3700 first deed of trust. Miss Baehr married Gilbert F. Cox in 1938. Mrs. Cox and plaintiff both testified that she paid no part of the consideration, at no time claimed any interest in the lots and "was the record holder only."

In November, 1941, plaintiff secured a $10,000 loan on the lots from John H. Armbruster & Co., a corporation engaged in the real estate business in St. Louis. John H. Armbruster was president, William LaBagge was vice president and sales manager and Walter F. Faerber was secretary. Armbruster and LaBagge went with plaintiff to look over the lots. There is a conflict in the evidence as to whether plaintiff told Armbruster and LaBagge that, while the record owner was Mrs. Cox, the lots were "really plaintiff's." The minutes of the Armbruster board meeting showed approval of a loan to "Grover Godwin on vacant lots." The loan was handled by Armbruster and, apparently, neither LaBagge nor Faerber had any knowledge that plaintiff personally had any interest in the lots. Armbruster did not recall that plaintiff represented himself as the owner. Armbruster testified that he told the other members of the company's board that "Godwin had brought in an application for a loan of $10,000 and that I thought the loan was a good loan; * * * we told Mr. Godwin the loan was granted and asked him how he wanted the papers prepared, and he said that the property was in the name of Cox and his wife, and so we prepared the papers accordingly and sent them to him to get signed by his client. * * * We made up the papers on the representation that Cox was the owner of the property."

Plaintiff delivered to the company a $10,000 note due in 3 years, and 6 interest notes for $300 each, due in 6, 12, 18, 24, 30 and 36 months, respectively, all dated December 1, 1941, and payable at the office of the company. The notes and the deed of trust securing them were signed by Gilbert F. Cox and " Gertrude E. Cox, formerly Gertrude E. Baehr." The deed of trust contained a note "acceleration" clause. LaBagge was trustee and Faerber was the payee of the notes and beneficiary. After recording the deed of trust, the

company paid the $10,000, less commission, either to plaintiff directly or, at plaintiff's direction, to others. Some such payments were of special tax bills and of city and county taxes; others were in liquidation and release of the outstanding encumbrance against some of the lots. Neither Mrs. Cox nor her husband received any of the proceeds of the loan.

These payments by plaintiff's instructions were, according to Armbruster, the usual practice in the real estate business. He testified that he did not look to the Coxes for directions; "in all our dealings, when a Realtor brings in the deed of trust, we go by his wishes because the owner must have faith in him to give him their signed deed of trust; a deed of trust is a negotiable paper and as long as we have it in our possession we pay out the proceeds to whomever delivers the loan deed of trust papers to us."

The notes and deed of trust were negotiated by the company to a Lillian Timmerman who in turn negotiated them to a Henry Muntze, a real estate broker, in February or March, 1943. Muntze sold them, in April, 1943, either to Gerling individually, or to the Gerling Realty and Building Company, a corporation of which Gerling was president, for $4500. Gerling was not associated in business with the Armbruster Company nor with any of its officers. Plaintiff testified that, sometime in 1939 or 1940, he showed the lots to Gerling and told him they were his (plaintiff's). This Gerling denied.

Plaintiff paid the $300 interest note due June 1, 1942. It does not appear when the notes were negotiated by the company or whether the company accepted this payment as the holder of the notes or as agent for the holder. Apparently, the company wrote plaintiff in December, 1942, regarding the December 1, 1942, $300 interest note, and plaintiff replied, stating he was in the army and asked waiver of "this and subsequent payments for the duration of the war." Plaintiff also wrote the local tax officials requesting "moratorium on the taxes without penalty." When he entered service, September 24, 1942, none of the other notes were in default. Nor were there, at that time, any taxes due and payable. Gerling paid the taxes for the years 1942-1945, inclusive.

In August, 1942, plaintiff "anticipated being called into service" and asked Mrs. Cox and her husband to deed the lots to him. The Coxes, as "Gertrude B. Cox, formerly Gertrude E. Baehr, and Gilbert F. Cox, her husband," conveyed to plaintiff by warranty deed, "subject to a first deed of trust." This warranty deed was never acknowledged and, of course, was not recorded. Plaintiff "intended to have a notary acknowledgment put on it, but during the rush of things and getting ready to get into the army, I just didn't do it." Mrs. Cox did not recall why it was not notarized "unless it was just neglected."

Around July 1, 1944, Gerling, as owner of the notes and deed of trust, requested LaBagge, the trustee, to sell the lots, under the power of sale in the deed of trust, because of default in the payment of interest notes. After publication of notice of sale, LaBagge sold the lots at public sale for $4800. Gerling was the purchaser. By trustee's deed dated July 19, 1944, LaBagge conveyed the lots to Gerling and his wife. The trustee's deed referred to the deed of trust executed by "Gertrude E. Cox (also known as Gertrude B. Cox, formerly known as Gertrude E. Baehr) and Gilbert F. Cox, her husband, dated December 1, 1941, and recorded in the Recorder's office of the County of St. Louis and State of Missouri, in Book 1842, p. 40."

Gerling executed and filed with LaBagge his affidavit that "of his own knowledge, Gertrude E. Cox (also known as Gertrude B. Cox, formerly known as Gertrude E. Baehr) and Gilbert F. Cox, her husband, were not on the 19th day of July, 1944, the date upon which the above described property was sold at foreclosure sale, nor were they within the period of three months next prior thereto (a) in the Federal service on active duty * * * or (b) in training or being educated * * * preliminary to' induction into military service within the purview of the Soldiers' and Sailors' Relief Act of 1940. And affiant further states that the said Gertrude E. Cox and Gilbert F. Cox were alive on the above-mentioned date." Gerling testified that he "had it from a reliable source" that neither of the Coxes were in military service and that he "had made an investigation and found they weren't." Neither Mrs. Cox nor her husband were ever in service.

After recording the trustee's deed, Gerling and his wife, by warranty deeds, conveyed some of the lots to James R. Cody and others to Austin L. Emert. Cody and Emert were partners in the building business. After recording their deeds, Cody and Emert made valuable improvements, constructed homes on a number of the lots and subsequently sold and conveyed these homes by warranty deeds which also were recorded.

Plaintiff had obtained other loans from the Armbruster Co. "later on in 1942 prior to my entry into service." Some were upon lots in the same subdivision as the lots involved here. Title to these other lots had also previously been in Mrs. Cox but, before he secured the loans, "I had her convey to me." These loans were made by the company "under the name of Grover Godwin." Asked why he had not followed the same procedure and executed the Cox notes and deed of trust himself, plaintiff replied that "it was more convenient leaving those lots in her name."

Prior to entering service plaintiff owned properties, the recorded title to which was in his own name. They were "in my name because I gave a mortgage on it and I had to sign it myself." Asked if,

when he made a mortgage on any property he was interested in, he signed the mortgage himself, plaintiff said: "No, I would not say that. These properties would only be mortgaged to people of some substance or something like that, and that was the reason I took it in my name." By this, plaintiff explained, he meant such loans would be made only to "people with some substance, someone who has stability, you don't make loans to anybody who isn't financially responsible. * * * Q. You mean you took them in your name because you had financial responsibility and that the mortgagee required you to have title in your name? A. That is the way it was, I felt that having them in my name I would get the mortgage that I wanted. Q. And your reasons for that was because you were financially responsible? A. That is correct. Q. And that was done not at the request of the mortgagee, but because you felt that was a good thing to do? A. That is right."

Plaintiff testified that in the spring of 1946, when he was in St. Louis on sick leave, he told LaBagge that he wanted "to pay off the loan and get my property clear"; that LaBagge said he thought that could be done and that he thought the notes were at the St. Louis Union Trust Company. In his deposition, LaBagge testified he thought plaintiff was talking about the notes and deeds of trust which plaintiff had personally executed and negotiated through the Armbruster Co.

As plaintiff says in his brief, "the evidence as to the reasonable market value of the property and of the improvements thereon consisted of a great number of opinions expressed by numerous witnesses. Volume 3 of the transcript contains the voluminous testimony of these witnesses, but because of the very nature of the evidence, it cannot be condensed or digested." We have studied the transcript and find that plaintiff failed to show by the preponderance of the evidence that the fair market value of the lots in 1944 was as much as $10,000, the amount of the Cox loan and deed of trust. Plaintiff's own experts testified that "there was no market value in 1944 in subdivision land" because of wartime restrictions upon building materials and construction. A fair indication of the reduced value of the lots between December 1, 1941, and July 1, 1944, is the depreciation in the value of the notes themselves between those dates. Following the usual course of such negotiable instruments, and passing through the hands of bona fide purchasers, investors or dealers in such commercial paper, the $10,000 note was sold by Muntze to Gerling for $4500, fifteen months before the trustee's sale. And the evidence showed that the increase in the value of the lots after July 1, 1944, was due solely to the costly improvements made by various defendants.

Among other stipulations below was: "That with the exception of L. William Gerling and William LaBagge, both as an individual

and as a trustee, none of the defendants had any verbal or written notice of any adverse claim of the plaintiff, and had only such notice, if any, as would be imputed to them by law." Plaintiff failed to show by the preponderance of the evidence that either Gerling or LaBagge, as an individual or as trustee, had any actual notice of plaintiff's claim of interest in the lots. Considering the evidence in the light most favorable to defendants, and with due deference to the findings of the trial judge, we find that neither Gerling nor LaBagge had actual notice and, like the other defendants, "had only such notice, if any, as would be imputed to them by law."

Among the allegations of the petition were: that plaintiff was at all times mentioned the "real and actual owner" of the lots; that Mrs. Cox, then Miss Baehr, became the "record owner" in 1937 and remained the "record owner" until August 14, 1942 (date of the Cox deed to plaintiff); that Faerber "endorsed the notes without recourse"; that both Gerling and LaBagge knew plaintiff was the "real and actual owner" and knew that Mrs. Cox was the "record owner for plaintiff merely as an accommodation and a favor to plaintiff and held the record title for and in behalf of plaintiff," and knew that the loan had been made to plaintiff; that LaBagge knew these things on December 1, 1941; that, "on August 14, 1942, Mrs. Cox divested herself of the title and her interest in and to the property and plaintiff thereupon became the owner of the fee simple title"; that LaBagge knew plaintiff was in service on July 1, 1944, the date of the trustee's sale; that Gerling "knew or by the exercise of ordinary diligence would have known that plaintiff was in military service since September 24, 1942"; that the reasonable market value of the lots on July 1, 1944, was $35,000; that LaBagge knew Gerling's $4800 bid was inadequate, unreasonable and unfair; and denied that plaintiff had any knowledge of the sale until shortly prior to filing his suit.

██ Plaintiff asserts that he was the "equitable owner" and that Subsection 1 of Sec. 532 is not limited to "owners of record" or "legal owners." He cites: Hoffman v. Charlestown Five Cents Sav. Bank, 231 Mass. 324, 121 NE 15; Morse v. Stober, 233 Mass. 223, 123 NE 780, 9 A. L. R. 78; and Twitchell v. Home Owners' Loan Corp., 59 Ariz. 22, 122 P. 2d 210. These decisions support plaintiff's position.

There do not appear to be many cases wherein, as in the instant case, a soldier sued in equity to set aside foreclosure of a real estate mortgage under power of sale without court order. In Hoffman v. Charlestown Five Cents Sav. Bank, supra, plaintiff, "expecting to be called for service in the army," placed the legal title, subject to the mortgage later foreclosed, in his mother. "It was agreed between the plaintiff and his mother by an 'oral trust and general agreement' that the property should be his unless he failed to return from the war

and in that case it should be hers." The court's ruling was: "The plaintiff was the equitable owner of the property here in question, although the trust and agreement which brought his equitable owner-ship into being was within the statute of frauds. * * * The de-fense of the statute of frauds is a defense which is personal to the maker of the contract and cannot be set up by a third person. * * * As against third persons a contract within the statute of frauds is effective although the statute is not satisfied."

Of the contention that the mortgagee "had no notice or reason to suppose that the plaintiff was the owner," the court said: "There is nothing in the section here in question which limits its provisions to owners of record or to cases where the mortgagee in fact knew or had reason to know who the owner of the property was. The act in terms includes every case where the mortgaged property is 'owned by a person in the military service at the commencement of the period of military service and (is) still so owned by him.' "

In Kendall v. Bolster, 239 Mass. 152, 131 NE 319, the assignee of a mortgage, executed by plaintiff and another trustee of a recorded declaration of trust, foreclosed under power of sale. After plaintiff entered service, a certificate for shares in the trust was issued to him and three weeks later he resigned as trustee. "Before the issuance of this certificate he was not the legal owner of any shares in the trust, but he contends that before his entry into the service an oral agreement was made by him with Hale as trustee, by which he became entitled in equity to these thirty shares; that he was the equitable owner of them; and that the issuance of the certificate having been made in accordance with the agreement merely converted ▆▆▆ his equitable title into a legal title." The court assumed without de-ciding that plaintiff "was an 'owner' or entitled to the rights of an owner," but denied relief because the obligation secured by the foreclosed mortgage did not originate prior to the effective date of the 1918 Act.

Morse v. Stober, supra, was a suit to enforce performance of a contract to purchase land. Plaintiff-vendor had foreclosed a mort-gage and "good and clear title" was the issue. Following Hoffman v. Charlestown Five Cents Sav. Bank, supra, the court said: "A mortgagee who forecloses his mortgage under the power of sale therein contained, without an order of court * * * assumes a heavy burden of proof when he undertakes to enforce specific performance of his agreement to convey by good title the land so foreclosed. * * * Circumstances attendant upon the history of a particular title and its record owners may be such as to exclude every rational hypothesis compatible with the notion that a person in the military service of the United States has an interest in it likely to be affected by the foreclosure. Evidence may make it clear beyond a reasonable doubt that no such person has any interest in specified

real estate. * * * The question whether in truth a person in military service in the United States had any interest in the premises which are the subject of the present suit was one of fact and not of law.'' And see Petition of Institution for Savings in Newburyport and Its Vicinity, 309 Mass. 12, 33 NE 2d 526.

Twitchell v. Home Owners' Loan Corp., supra, was a court foreclosure under Subsection 2 of Sec. 532. Intervenor asserted that he had an ''equitable interest'' in the land by agreement with the mortgagor, his mother, whereby, in consideration of support and making payments on the mortgage debt, she would convey the land to him subject to the mortgage; and that he had performed his part of the agreement. Of the Act, the court said: ''We think it would violate its spirit if it were held to protect only legal, and not equitable interests.''

In John Hancock Mut. Life Ins. Co. v. Lester, 234 Mass. 559, 125 NE 594, also a court foreclosure, it was urged that the shareholders of a building trust were ''owners'' under the Act. The court said that this contention was ''assumed to be correct under the decision in the Hoffman case.'' See also Lynn Institution for Savings v. Taff, 314 Mass. 380, 50 NE 2d 203, also a court foreclosure.

This court is thoroughly in accord with the often expressed purposes of the Act, with the universally accepted approach of construction favorable to the soldier, with the desire to resolve in his favor every reasonable doubt and to accord to him every benefit Congress intended him to have. Boone v. Lightner, 319 U. S. 561, 63 S. Ct. 1223, 87 L. Ed. 1587; and Stockton v. Ford Motor Co., 61 F. Supp. 261. However, it is our duty to construe this Act to determine the intent of Congress. ''The judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed.'' Ebert v. Poston, 266 U. S. 548, 45 S. Ct. 188, 69 L. Ed. 435.

Congress did not define ''owned,'' or the related terms, ''owner'' or ''ownership.'' So far as we have been able to ascertain, the United States Supreme Court has not ruled this issue. (In Ebert v. Poston, supra, the court found it unnecessary to rule whether the owner of a redemption right was an ''owner.'') The Massachusetts Supreme Court has ruled that the Act is not limited to record owners. The same court and the Arizona Supreme Court have held that the Act applies to what they term ''equitable owners.'' Despite our respect for the opinions of these two courts, and despite our effort to make the most possible liberal construction of the Act, we are forced to a contrary conclusion.

Under the recording laws, neither the soldier in the Hoffman and Twitchell cases, nor the instant plaintiff (either before or after securing the Cox deed), was an ''equitable owner.'' In all three instances: the ''legal ownership'' and the ''equitable owner-

ship'' was recorded in others; the soldier had *only a claim* assertable in equity *only* against one of the record owners *personally*, but not against the other record owners; the soldier's ''equitable claim'' (as distinguished from ''equitable ownership'') was not an estate or interest in land, was ''ownership'' only as to one of the record owners, and was not ''ownership'' as to the other record owners or subsequent bona fide purchasers. Under the recording statutes, where innocent third persons are involved, a soldier holder of an ''equitable claim'' is not an ''owner.''

Plaintiff asserts that the Missouri law in reference to bona fide purchasers was superseded by the Act. Did Congress intend that the states' recording acts be ignored and that ''ownership'' of lands be transferred by secret oral or unrecorded written agreement? To carry out the Congressional purpose of protecting the soldier, is it necessary that the recording laws be nullified? We think not. We do not believe that Congress intended to create a new form of ''ownership'' or to supersede state laws which, in effect and in fact, make ''ownership'' a relative matter, dependent upon the particular circumstances of each case and often existent only as to certain parties.

In Missouri, an ''owner,'' either ''legal'' or ''equitable,'' is a record owner so far as bona fide purchasers are concerned. Our recording laws require that ''conveyances of lands, or of any estate or *interest therein*'' be by acknowledged and recorded deed. Sec. 3401 (442.020). (References to Missouri statutes are to Mo. RS 1939 and Mo. RSA, followed by citation of Mo. RS 1949). Acknowledgment and recordation are necessary for every instrument ''affecting real estate *in law or equity*.'' Secs. 3408 (442.150) and 3426 (442.380). The recorded instrument imparts notice to all persons and all subsequent purchasers; and mortgagees are ''deemed, *in law and in equity*'' to purchase with notice only from the time the instrument is filed for record. Sec. 3427 (442.390). Prior to such filing, the instrument is valid *only* ''between the parties thereto, and such as have actual notice thereof.'' Sec. 3428 (442.400). (Italics ours.)

We agree with plaintiff that the Cox unacknowledged, unrecorded deed to him was valid *as to them*. Murphy v. Butler County, 352 Mo. 1082, 180 SW 2d 732. And plaintiff does not challenge the rule that ''an innocent purchaser for value takes the title discharged of secret outstanding equities not of record.'' Hendricks v. Calloway, 211 Mo. 536, 111 SW 60. See also Fox v. Hall, 74 Mo. 315, and Harrison v. Moore, (Mo. Sup.) 199 SW 188. His position is that not only is ''the Missouri law in reference to bona fide purchasers superseded'' by the Act, but defendants are not bona fide purchasers because the chain of title, containing a foreclosure without court order shows ''a very vital defect or flaw which in itself would be sufficient to charge defendants with notice of said flaw or defect

32

and they would thereby be deprived of the status of a bona fide purchaser."

What notice of plaintiff's "equitable claim" is imputed to defendants by the Act itself? Does it impute notice that someone who *might* have, by secret agreement or otherwise, a claim against one of the record owners *might* be in service? Did Sec. 532 charge these defendants with knowledge that this plaintiff, a complete stranger to the record title, had a secret, unrecorded claim which he might assert against the Coxes, the mortgagors of record, to have their recorded title conveyed to him under a resulting trust? *Or* did the section charge these purchasers only with the duty of making sure that neither of the Coxes, the record owners, was in the service?

For illustration purposes, assume that, during the war, this plaintiff soldier, while in India, conveyed to an airman flying "The Hump" who conveyed to a marine on Okinawa who conveyed to a sailor in the Mediterranean Fleet who conveyed to a coastguardsman at New London, Conn.; and that none of these conveyances were recorded. The holder of the notes could not possibly know, or have any means of knowing, about these secret transfers. It cannot be seriously urged that the Congressional intent was to impute to the holder of the mortgage debt notice that these successive secret grantees were in service.

The purpose of the Act was to protect the soldier and his dependents. However, read in its entirety, the Act generally extends that protection only as to the *soldier's liability* under an obligation either entered into directly by *him* or assumed by *him* prior to entering service. Here plaintiff had no liability whatsoever. He was not the maker of the notes or of the deed of trust securing them. His deed from the Coxes was only "subject to" the obligation of the notes.

We believe that these defendants were charged only with the duty of ascertaining whether either of the Coxes, the obligees of record and the only obligees, was in service. Accordingly, we rule that the Act did not impute to the defendants notice of plaintiff's secret claim against the Coxes personally; and that the defendants were bona fide purchasers.

 Finally, plaintiff has asked a court of equity to set aside a deed. "It is the rule that a court of equity will not aid one who comes into court with unclean hands. * * * A court of equity will look into the very spirit of the transaction involved and decide for itself whether a cause, otherwise meritorious, is based upon such a dishonest purpose as to justify a refusal to entertain a suit involving such a transaction. * * * But misconduct which will bar an action in equity does not necessarily need to be fraudulent, it is enough that the party seeking relief has been guilty of inequitable conduct in the very matter about which affirmative relief is sought." Moore v. Carter, 356 Mo. 351, 201 SW 2d 923.

Under all the circumstances, what are the equities of the parties here? The record does not show fraud on the part of any of the defendants, and plaintiff's conduct was neither illegal nor actually fraudulent. Compare Church v. Brown, 247 Mass. 282, 142 NE 91. The circumstances as to the Cox deed to plaintiff do suggest that he may have taken the deed with intent to delay the enforcement of the mortgagee's rights by taking advantage of the Act. See Sec. 580. And compare the facts in the following cases involving court foreclosures: Radding v. Ninth Federal Sav. & Loan Assn., 55 F. Supp. 361, where the soldier took a record title the same day he entered service; (in the state court, Radding was a defendant in Ninth Federal Sav. & Loan Assn. v. Parkway West Corp. et al., 181 Misc. 244, 48 NYS 2d 760 and 762); Lima Oil & Gas Co. v. Pritchard, 92 Okla. 113, 218 P. 863, where the soldier took record title six weeks before induction; and Reid v. Margolis, 44 NYS 2d 518, where the soldier took record title one month after induction. See also Flushing Sav. Bank v. Hallewell, 35 NYS 2d 521.

But assume that plaintiff did not secure his unrecordable deed with intent to delay enforcement of the obligation of the notes. By failing to record his secret interest, and by withholding from record notice that he had acquired the Cox's title, plaintiff provided a means whereby fraud might be perpetrated against innocent third persons. We believe that Congress did not intend the provisions of the Act to be so used; and did not contemplate that they would be invoked against bona fide purchasers in justification of the soldier's calculated conduct prior to, and in anticipation of, his entry into service.

The deed which plaintiff would have us nullify is one under which innocent third persons claim and under which they either made valuable improvements or bought or loaned money upon the improved lots. Such deed was made under power of sale contained in a deed executed by plaintiff's strawman. Plaintiff urges that "a strawman in real estate purposes may be used for proper as well as improper purposes." But "real estate transactions made through strawmen and ghosts should always be viewed with suspicion." Ryan v. Stubblefield, (Mo. Sup.) 100 SW 2d 444. And see Houtz v. Hellman, 228 Mo. 655, 128 SW 1001.

Plaintiff used a strawman for his own "convenience." The trustee's deed was the result of foreclosure of the strawman's (not plaintiff's) deed of trust for default in the strawman's (not plaintiff's) negotiable notes. Plaintiff himself, for his own "convenience" caused these notes to be cast into the river of finance, eventually to drift into the chute of bona fide purchasers. As pointed out in Merrill v. Davis, 359 Mo. 1191, 225 SW 2d 763, and authorities cited therein, such practice has its pitfalls and dangers.

Preparatory to entering service, plaintiff took the unacknowledged, unrecordable deed from the Coxes. He says he "neglected" to have

it acknowledged. As a result, he obtained only a deed valid as to the Coxes individually. Preparing to enter service, he did not, purposely or otherwise, secure a conveyance which could have been recorded, and which, when recorded, would have been notice to the world that he, not the Coxes, owned the lots subject to but not in assumption of the obligation of the Cox deed of trust.

Plaintiff had been engaged in the real estate business for many years. He had handled hundreds of real estate transfers for others and for himself. He had caused conveyances, mortgages and deeds of trust to be executed, and had handled loans upon real estate. He had probably supervised foreclosures. He knew that only the mortgagor was personally liable upon the mortgage note. His own testimony suggests that he handled the matter through the Coxes for the purpose of avoiding personal liability upon the notes. He knew that there was no equity of redemption after foreclosure under power of sale. He was thoroughly familiar with the requirements of the recording statutes. He knew that his deed from the Coxes was valid only as to them. He knew that it was not binding upon anyone who, in the absence of actual knowledge, relied upon the public records. Being in a position to give the world notice of his claim, he failed to do so.

So plaintiff's conduct, though lawful, was deliberate and calculated. For his own "convenience" and by his own "neglect," plaintiff is in the position of having "raised a false report," and now is as the man "that deceiveth his neighbor, and saith, Am I not in sport?"

Plaintiff claims the foreclosure was void, seeks no money judgment, does not allege that he could or would pay the mortgage debt, asks only that the title be declared vested in him subject to the mortgage, and makes no offer to do equity to the subsequent purchasers who made or paid for improvements vastly increasing the value of the lots.

The equities are with the defendants. The trial judge properly refused to permit plaintiff to prevail as against the legal and equitable owners of record—the bona fide holders of the mortgage obligation and the bona fide purchasers who had relied upon the public records. The judgment is affirmed. *Van Osdol* and *Aschemeyer, CC.,* concur.

PER CURIAM:—The foregoing opinion by Lozier, C., is adopted as the opinion of the court. All the judges concur.